**SECOND DIVISION**
**DOYLE, C. J.,**
**MILLER, P. J., and REESE, J.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**June 14, 2017**

# In the Court of Appeals of Georgia

A17A0068. LESLIE v. THE STATE.

REESE, Judge.

A Bartow County jury found Christopher Leslie guilty beyond a reasonable doubt of three counts of cruelty to a child in the second degree, OCGA § 16-5-70 (c), and two counts of false imprisonment, OCGA § 16-5-41 (a). He appeals pro se from the denial of his motion for new trial, contending that the trial court erred in ruling that certain affirmative defenses were not applicable; in failing to instruct the jury, sua sponte, on those affirmative defenses; and in excluding certain evidence. He also claims that the evidence was insufficient to support his convictions and that he received ineffective assistance of counsel. For the reasons that follow, infra, we affirm.

1. The Appellant contends that the State failed to present sufficient evidence for the jury to convict him of the offenses as charged, particularly given his defense

that the acts at issue were necessary to discipline the child and were justified under the circumstances.

"On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict[,] and an appellant no longer enjoys the presumption of innocence."[1]

> Because a jury found [the Appellant] guilty, this Court looks only to see if there is a factual basis from which a rational trier of fact could conclude beyond a reasonable doubt that a guilty verdict was warranted. We do not judge the credibility of the witnesses. We do not revisit conflicts in the evidence. And we will not simply substitute our opinion for that of the jury. So long as there is some competent evidence to support each element of the offenses as charged, the jury's verdict will be upheld.[2]

Viewed in this light, the evidence shows the following facts. In March 2010, the Appellant lived in Bartow County with his wife, his two sons (who were seven and ten years old), and his two step-children. On Friday, March 26, 2010, the Appellant built a wooden box that was approximately two feet by four feet by two feet, made from plywood and two-by-four beams. The box's lid was attached with

---

[1] *Rankin v. State*, 278 Ga. 704, 705 (606 SE2d 269) (2004) (citation omitted).

[2] *Frasier v. State*, 295 Ga. App. 596, 598-599 (2) (672 SE2d 668) (2009) (citation and punctuation omitted).

hinges and had a hasp that could be locked from the outside. The box had no holes for light or air to enter. According to the Appellant, he built the box for the specific purpose of placing his younger son (hereinafter, "the victim") inside it to calm him down; to discipline him; and to teach him to behave, listen, and follow orders when other forms of punishment did not work.

The next day, the Appellant put a sleeping bag and pillow inside the box, then grabbed the victim's arm and leg and forced him into the box. He then secured the latch with a screwdriver and set the microwave timer for 30 minutes. While in the box, the victim screamed, kicked, and yelled out that he was hot and could not breathe. According to the victim, when he screamed, his father put a blanket over the box. After about 30 minutes, the Appellant released the victim, who "never calmed down," but who behaved properly the rest of the day.

The next evening, the Appellant put the victim in the box for another 30-minute period. The Appellant's wife was present, however, and, when the victim screamed that he was very hot and could not breathe, she opened the box and wiped his face with a cool cloth. The Appellant then closed the lid, locked it with a screwdriver, and kept the victim inside the box for the remainder of the 30 minutes.

When the victim returned to school on Monday, his teacher and the school counselor observed bruises on his arms and legs, and the counselor contacted the county office of the Department of Family and Children Services ("DFCS"). DFCS officials contacted the police department, and officers went to the Appellant's home the next day to investigate. When they arrived, the Appellant met them at the door and talked with them briefly before showing them the box, which he admitted building, and consenting to a search of the house. The officers seized the box and asked the Appellant to come to the station for an interview. The Appellant drove to the station, spoke with an officer in a videotaped interview,[3] and then went home. Later that day, officers arrested the Appellant at his home on charges of cruelty to children and false imprisonment.[4]

The evidence also showed that, prior to building the box, the Appellant punished the victim by locking him in a storage container that was under the bed in the sleeper compartment of his tractor-trailer. On other occasions, the Appellant put

---

[3] The State played the recording of the interview for the jury at trial without objection.

[4] Officers also interviewed the Appellant's wife (the victim's step-mother), and, after she made statements incriminating herself in the crimes against the victim, they placed her under arrest. The Appellant and his wife were jointly tried, but she was acquitted on all charges, and she is not a party to this appeal.

4

the victim in a sleeping bag and tied ropes around it to keep him inside. In addition, when the victim screamed or yelled while being punished or restrained, the Appellant put crushed red pepper in his mouth. In fact, the Appellant admitted to putting the following substances in the victim's mouth in an effort to quiet him: crushed red pepper, cayenne pepper, ground cinnamon, vinegar, lemon pepper, ground cloves, pepper sauce, and hot sauce.

The State presented the testimony of a child psychologist who was treating the victim at the time of the March 2011 trial, after diagnosing him with Post-Traumatic Stress Disorder ("PTSD") in June 2010. The psychologist testified that she based her diagnosis on the victim's statements to her that he had been "placed in a box by his father for periods of time on repeated occasions," adding that the victim talked about "the terror he felt, feeling like he couldn't breathe, crying and pounding on the box and being scared to death not knowing how long he was going to be in there." According to the psychologist, the victim described feeling "very scared, very angry, [and] very sad" when he was in the box. The victim also reported having nightmares about the box and told her that he did not like to be in any kind of "closed-in space." In fact, during play-therapy sessions, the victim would often put toys in a toy chest,

then create "rescue scenarios" where someone would come in and rescue the toys from the box.

The psychologist also testified that binding a child in a sleeping bag was not a discipline technique that was approved and accepted by reputable organizations. Further, she testified that, in her opinion, placing a child in an enclosed box where he or she felt that they could not breathe, as in this case, "crosse[d] the line of abuse" and was not an appropriate discipline technique. According to the psychologist, she based her diagnosis of PTSD on symptoms that the victim was experiencing, and those symptoms were directly related to his having been locked in the box.

After considering the evidence and the applicable law, the jury found the Appellant not guilty on three counts of child cruelty in the first degree, but it found him guilty on two counts of child cruelty in the second degree and two counts of false imprisonment based upon his locking the victim in the box, and one count of child cruelty in the second degree based upon his binding the victim in the sleeping bag.[5]

---

[5] See OCGA §§ 16-5-70 (c) (A "person commits the offense of cruelty to children in the second degree when such person with criminal negligence causes a child under the age of 18 cruel or excessive . . . mental pain."); 16-5-41 (a) (A "person commits the offense of false imprisonment when, in violation of the personal liberty of another, he arrests, confines, or detains such person without legal authority."); see also OCGA § 16-5-70 (b) (A "person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the

6

Implicit in this verdict is the jury's rejection of the Appellant's defense that his actions were justified as reasonable parental discipline. It was up to the jury to determine whether the circumstances justified the Appellant's conduct, and this Court will not interfere with that determination as long as it was supported by evidence at trial.[6]

Having reviewed the trial transcript, we conclude that the evidence presented was sufficient for the jury to find the Appellant guilty beyond a reasonable doubt of the crimes charged.

2. The Appellant contends that the trial court abused its discretion when it prohibited him from introducing evidence of prior acts of violence committed by the victim against a former teacher and classmates.[7] We disagree.

The record shows that the State filed a motion in limine asking the court to exclude evidence of alleged prior bad acts by the victim toward third parties who

age of 18 cruel or excessive . . . mental pain.").

[6] See *Frasier*, 295 Ga. App. at 599 (2) (a); see also *Haji v. State*, 331 Ga. App. 116, 119 (3) (769 SE2d 811) (2015) (whether the defendant's acts fell within the realm of reasonable parental discipline and whether those acts caused the child to experience excessive pain were questions to be decided by the factfinder).

[7] See *Carter v. State*, 296 Ga. App. 598, 601, n. 7 (675 SE2d 320) (2009) (This Court reviews a trial court's ruling on the admission of evidence under an abuse of discretion standard.).

were not his family members, specifically acts committed when he was five years old against his former kindergarten teacher and his classmates. Following a hearing, the court ruled that the evidence was inadmissible character evidence and irrelevant because the teacher and classmates were not parties to the instant case, and because the alleged bad acts were too remote in time, having occurred approximately two years and eight months before the incidents at issue.[8] The Appellant's counsel subsequently proffered the evidence that he would have presented at trial to demonstrate the victim's prior bad acts. Specifically, he stated that the victim's kindergarten teacher would testify that, in August and September 2007, the victim repeatedly slapped, punched, shoved, or kicked the teacher and the victim's classmates. The court reaffirmed its earlier ruling and excluded the evidence.

The Appellant argues that the court erred in excluding evidence of the victim's prior bad acts toward third parties, complaining that this evidence would have supported his claim that he was acting in self-defense when he committed the acts at issue.

---

[8] We note that the court did not prevent the Appellant from eliciting extensive evidence about the victim's aggressive acts toward family members with whom he was living, and the Appellant was able to testify generally about the victim's behavioral problems at school.

Under Georgia's former Evidence Code, a defendant claiming self-defense justification could introduce evidence of specific violent acts by the victim against third parties.[9] The defendant, however, carried the burden of proving that the specific violent acts should be admitted and had to, at a minimum, (1) follow the procedural requirements for introducing the evidence, (2) establish the existence of prior violent acts by competent evidence, and (3) make a prima facie showing of justification. To make a prima facie case of justification, the defendant was required to show that the victim was the aggressor, the victim assaulted the defendant, and the defendant was honestly trying to defend himself.[10]

In this case, there was no evidence to support a finding that the seven-year-old victim presented an imminent violent threat to the Appellant and that the Appellant was forced to defend himself by locking the victim in the box or tying him up in a

---

[9] See *Chandler v. State*, 261 Ga. 402, 407 (405 SE2d 669) (1991), overruled in part, *Mohamud v. State*, 297 Ga. 532, 535-536 (3) (773 SE2d 755) (2015) (holding that the rule set forth in *Chandler* has been superseded by provisions of the new Evidence Code). Although the *Chandler* evidentiary rule no longer remains viable under Georgia's new Evidence Code, it applies in this case because Leslie's trial occurred before January 1, 2013, the new Evidence Code's effective date. See Ga. L. 2011, p. 99, §§ 1, 101; *Wright v. State*, 300 Ga. 185, 188 (3), n. 3 (794 SE2d 105) (2016).

[10] *Wright*, 300 Ga. at 188 (3) (citations, punctuation, and footnote omitted). See OCGA § 16-3-21 (a) ("A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force[.]").

sleeping bag. Instead, the Appellant admitted that he used books and the Internet to research different methods of discipline and that he planned and built the box with the intention of using it to punish the victim; to calm him down; and to teach him to behave, be nice, listen to his parents and teachers, and follow orders so he would realize "we are the boss, he's not the boss." According to the Appellant, he needed to find a way to discipline the victim, explaining that the child was "getting stronger and it's hard to hold him down." The Appellant also testified that he wanted to use it to keep the victim from going into "fits of rage" that he (the Appellant) did not know how to deal with and that he was concerned that the other forms of punishment he often used, such as spanking him with a wire flyswatter, would bruise or leave marks on the victim. These admissions were corroborated by other witnesses, who testified that the Appellant had said he put the victim in the box to control him or to punish him for his bad behavior.

Moreover, during his interview with an investigator, which was within three days of the first time he locked the victim in the box, the Appellant admitted that he could not remember what the victim had done that caused him (the Appellant) to use that punishment. As for why he locked the victim in the box the next day, the Appellant told officers that the victim had failed to do his homework, and that, when

10

the Appellant tried to punish him by sending him to his room, the child would not stay in the room and screamed and called him names. The Appellant then spanked the child before locking him in the box for 30 minutes. Notably, the Appellant never told the investigator that he put the victim in the box in an effort to defend himself, his wife, or the child's siblings from imminent harm because the child was hitting, kicking, or otherwise hurting them at that moment.

Likewise, the Appellant never told the investigator that the victim climbed into the box voluntarily. At trial, however, the Appellant claimed that, on both occasions, he talked to the victim while the victim "still had a reasoning capability" and gave the victim a choice of punishments: he could sit in the box for 30 minutes or stay in his room for the rest of the day. According to the Appellant, the victim voluntarily chose the former option. Thus, the Appellant's own trial testimony demonstrated that the victim was not threatening him with imminent harm at either time the Appellant locked him in the box.

As for what caused him to tie up the victim in the sleeping bag, the Appellant testified that he did not remember, stating only that it might have been because he had tried to spank the victim for some earlier misbehavior and the victim had tried to run

11

or fight back to avoid being punished.[11] According to the Appellant, he told the victim to get inside the sleeping bag, but, when the victim refused, the Appellant put the victim inside and tied him up. The Appellant told the victim that, if he got out, he would get another spanking and that he was "going to do what I ask[ed him] to do." The Appellant also admitted that he put pepper in the child's mouth *after* he had tied the victim in the sleeping bag, because the child had been very angry and was cursing.

Although the Appellant testified at trial that the victim had hit, kicked, bitten, and otherwise acted violently toward him and other family members, that testimony, when read in context, described the victim's behavior that purportedly caused the Appellant to regularly spank, restrain, or otherwise punish him, or it showed the victim's negative *reactions* to being punished. None of the evidence supported a finding that the victim was the initial aggressor who threatened the Appellant with an imminent, violent attack so that the Appellant was justified in restraining the victim in the box or the sleeping bag in an act of self-defense.

Instead, as the trial court found, the overwhelming evidence showed that the Appellant committed deliberate, pre-meditated acts of restraining the seven-year-old

---

[11] Notably, during his interview with the investigator, the Appellant did not tell the investigator that he had ever tied up the victim in the sleeping bag.

victim with the sole intention of punishing him for earlier bad behavior, and it was for the jury to decide whether those acts constituted reasonable parental discipline under the circumstances. It follows that, because the Appellant failed to present a prima facie case of self-defense to justify his actions, the trial court did not abuse its discretion in excluding evidence of prior bad acts committed by the victim against third parties.[12]

3. The Appellant contends that the trial court erred in failing to instruct the jury, sua sponte,[13] on the affirmative defense of justification under OCGA §§ 16-3-21 (a), 16-3-23, and 16-3-24 (a).

---

[12] See *Wright*, 300 Ga. at 188 (3); see also *Graham v. State*, 274 Ga. 696, 698 (3) (558 SE2d 395) (2002) (The defendant's testimony that he thought the victim had a gun and that he fired at the victim to scare him did not establish that the victim was the aggressor. As a result, the defendant failed to establish a prima facie case of justification that would have permitted him to introduce specific acts of violence committed by the victim against third parties.); *Walden v. State*, 267 Ga. 162, 163 (2) (a) (476 SE2d 259) (1996) (Even if the victim showed some aggressive behavior, the defendant still had to show that the victim assaulted him and that he was defending himself when he shot the victim. Because he failed to make this showing, the trial court did not err in excluding evidence of the victim's prior acts of violence toward third parties.).

[13] It is undisputed that the Appellant's attorneys did not request these jury instructions. See Division 4 (b), infra, regarding a related claim of ineffective assistance of counsel.

(a) As an initial matter, we note that the trial court instructed the jury on the affirmative defense of justification and on parental discipline,[14] as requested by the Appellant.

(b) In contrast, the court did not err in failing to charge the jury, sua sponte, on self-defense under OCGA § 16-3-21 (a), because the Appellant failed to request the

[14] The court instructed the jury as follows:
An affirmative defense is a defense that admits the doing of the act charged but seeks to justify, excuse, or mitigate it. Once an affirmative defense is raised, the burden is on the State to disprove it beyond a reasonable doubt. The fact that a person's conduct is justified is a defense to prosecution for any crime based on that conduct. The defense of justification can be claimed when the person's conduct is the reasonable discipline of a minor by his parent or a person in loco parentis[.] . . . A parent is justified in using corporal or physical punishment in order to discipline a minor child so long as the corporal punishment is reasonable. A parent is not justified in using corporal punishment to discipline a minor child if the corporal punishment maliciously causes the child cruel or excessive physical pain, harm, or injury. If you find from the evidence that the defendant did inflict corporal punishment upon the child in this case and you further find that it was reasonable and did not cause the child to suffer cruel or excessive physical or mental pain, harm, or injury, then the defendant would be justified, and it would be your duty to acquit the defendant. When the issue of justification in the exercise of parental discipline is raised by the evidence, the burden is on the State to disprove that the defendant was justified.

14

charge, there was no evidence to support it,[15] and it was not the Appellant's sole defense.[16]

(c) As for the affirmative defenses of defense of habitation under OCGA § 16-3-23,[17] and defense of property other than habitation under OCGA § 16-3-24 (a),[18] there was no evidence presented to support these instructions. In fact, the Appellant's

---

[15] See Divisions 1 and 2, supra; see also *Code v. State*, 255 Ga. App. 432, 434 (4) (565 SE2d 477) (2002) ("[E]ven if justification is a defendant's sole defense, it is not error to refuse the charge if there is no evidence to support it.") (footnote omitted).

[16] See *Chapel v. State*, 270 Ga. 151, 156 (7) (510 SE2d 802) (1998) ("The trial court was not required to give an instruction on alibi absent a defense request because alibi was not [the defendant's] sole defense.") (footnote omitted); cf. *Watts v. State*, 259 Ga. App. 531, 533 (3) (578 SE2d 231) (2003) ("If an affirmative defense is raised by the evidence, including the defendants' own statements, the trial court must present the affirmative defense to the jury as part of the case in its charge, even absent a request.") (citation and punctuation omitted).

[17] See OCGA § 16-3-23 ("A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to prevent or terminate such other's unlawful entry into or attack upon a habitation[.]").

[18] See OCGA § 16-3-24 (a) ("A person is justified in threatening or using force against another when and to the extent that he reasonably believes that such threat or force is necessary to prevent or terminate such other's trespass on or other tortious or criminal interference with real property other than a habitation or personal property: (1) Lawfully in his possession; (2) Lawfully in the possession of a member of his immediate family; or (3) Belonging to a person whose property he has a legal duty to protect.").

15

own trial testimony about why he locked the victim in the box and tied him in the sleeping bag never even suggested that he did so in order to prevent an "unlawful entry" into his home by the victim (who also lived there[19]) or to defend his home or property from an unlawful act by the victim.[20] Further, the Appellant failed to request these charges, and neither defense was his sole defense. Thus, the court did not err in failing to instruct the jury on these defenses.[21]

4. The Appellant contends that the trial court erred in rejecting his claim that he received ineffective assistance of counsel. The Appellant was represented by two attorneys during trial, and he asserts the same ineffective assistance claims against them jointly.

> In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the client that there is

---

[19] See generally *Stobbart v. State*, 272 Ga. 608, 612 (4) (533 SE2d 379) (2000) ("[D]efense of habitation is not a defense available to a defendant when the victim is a guest in the home.") (citation omitted).

[20] See generally *Barron v. State*, 219 Ga. App. 481, 482 (465 SE2d 529) (1995) (The defendant was not justified in using force against his spouse, from whom he was separated, to prevent her from taking personal property out of his car, because the property still belonged to them both. Thus, the defense of justification under OCGA § 16-3-24 (a) did not apply.).

[21] See *Chapel*, 270 Ga. at 156 (7); *Code*, 255 Ga. App. at 434 (4).

a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different.[22] The criminal defendant must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct. We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.[23]

"An appellate court evaluates counsel's performance from counsel's perspective at the time of trial. As a general rule, matters of reasonable tactics and strategy, whether wise or unwise, do not amount to ineffective assistance of counsel."[24] "Since an appellant claiming ineffective assistance of counsel must show both deficient performance and actual prejudice stemming from that deficiency, an insufficient showing on either of these prongs relieves the reviewing court of the need to address the other prong."[25]

---

[22] *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

[23] *Robinson v. State*, 277 Ga. 75, 75-76 (586 SE2d 313) (2003) (citations and punctuation omitted).

[24] *Grier v. State*, 273 Ga. 363, 365 (4) (541 SE2d 369) (2001) (citations and punctuation omitted).

[25] *Williams v. State*, 277 Ga. 853, 858 (6) (a) (596 SE2d 597) (2004) (citations and punctuation omitted).

(a) The Appellant complains that his attorneys failed to provide timely notice of his intention to introduce evidence of prior bad acts by the victim toward third parties. As shown in Division 2, supra, the trial court considered the merits of the notice and the attorneys' proffer of evidence before ruling that the evidence was inadmissible. And, as the Appellant concedes, the court did not exclude the evidence because the notice filed by the attorneys was untimely. Thus, pretermitting whether the attorneys failed to provide timely notice regarding the evidence, the Appellant has failed to demonstrate any prejudice arising from the oversight. It follows that he cannot prevail on this ineffective assistance claim.[26]

(b) The Appellant contends that his attorneys were ineffective for failing to pursue a defense based upon self-defense, defense of habitation, and defense of property other than habitation. However, as we have concluded in Divisions 2 and 3 (c), supra, there was no evidence to support these defenses, and the Appellant has not identified any other evidence that would have supported these defenses. Further, one of the Appellant's attorneys specifically testified at the motion for new trial hearing that he did not think a self-defense claim was appropriate in this case, primarily because the victim was seven years old and weighed about eighty to ninety pounds,

---

[26] See *Williams*, 277 Ga. at 858 (6) (a).

while the Appellant was about thirty years old and weighed 160 pounds. That was a reasonable strategic decision by trial counsel and did not amount to ineffective assistance.[27] It follows that this claim lacks merit.

(c) The Appellant contends that his attorneys were ineffective because they failed to call potential defense witnesses or interview other defense witnesses prior to trial. "The decisions on which witnesses to call and all other strategies and tactical decisions are the exclusive province of the lawyer after consultation with his client."[28] Such reasonable strategic decisions do not support a claim of ineffective assistance.[29]

(i) During the hearing on the motion for new trial, the only potential defense witness called by the Appellant was his mother, who testified about the victim's aggressive behavior toward her and other third parties. However, when asked by the prosecutor if she had ever tied up the victim in a sleeping bag or locked him in a box as a result of that behavior, the Appellant's mother responded that she had not, explaining that she did not agree with those methods of discipline. When asked about the Appellant's mother's testimony, one of the Appellant's attorneys testified that the

---

[27] See *Grier*, 273 Ga. at 365 (4).

[28] *Moreland v. State*, 263 Ga. App. 585, 588 (4) (588 SE2d 785) (2003) (citation and punctuation omitted).

[29] See *Grier*, 273 Ga. at 365 (4).

testimony would not have been relevant to the issues on trial. The attorney was correct, given the court's exclusion of evidence of prior bad acts by the victim toward third parties.[30] Moreover, the Appellant has failed to show that his mother's testimony would have been more beneficial than problematic to his defense, considering her clear expression of disapproval of the acts at issue.[31]

(ii) One of the Appellant's attorneys also testified that he did not refuse to call any witness whom the Appellant had requested. He testified that the Appellant had identified several potential defense witnesses, and he had subpoenaed all of them. The attorney did not interview the witnesses prior to trial, however, because the Appellant had specifically told him that these witnesses would testify in his favor, and he relied on the Appellant's assurances. When planning defense strategy, counsel is entitled to rely on the veracity of his client's assertions,[32] and counsel is not required to anticipate that his client may have misled him.[33] The Appellant has failed to demonstrate that counsel's reliance on him was unreasonable, and any prejudice that

_____

[30] See Division 2, supra.

[31] See *Williams*, 277 Ga. at 858 (6) (a) (A defendant claiming ineffective assistance must show both deficient performance by counsel and resulting prejudice.).

[32] See *Sparks v. State*, 277 Ga. 72, 74-75 (3) (586 SE2d 645) (2003).

[33] See *Nicholson v. State*, 265 Ga. 711, 715 (4) (462 SE2d 144) (1995).

resulted from such reliance was attributable to the Appellant, and not to the ineffectiveness of his counsel.[34]

(iii) As to an expert witness that the court excluded based upon the attorneys' failure to provide timely notice to the State, the Appellant's attorneys testified that the delay in identifying the witness was not due to their oversight, but, instead, was due to the Appellant's inability to pay for the expert's services.[35] Further, the Appellant failed to proffer the expert's report, so it cannot be considered on appeal.[36] Finally, one of the Appellant's attorneys testified that the defense expert who testified at trial "did the better job for us than any of the [other potential expert witnesses] and that's what I was depending on. . . . I didn't really feel that we needed to call [the other expert witness]." Consequently, the Appellant has not shown any prejudice that

---

[34] See id.

[35] See generally *Bowden v. Zant*, 244 Ga. 260-261 (1), (2) (260 SE2d 465) (1979) (holding that trial counsel could not be deemed ineffective for failing to call an expert witness under the circumstances, explaining that the law does not require counsel to pay "out of his own pocket" for an expert witness for an indigent defendant).

[36] See Court of Appeals Rule 24 (g) ("Do not attach documents or exhibits to appellate briefs[.]"); *Boatright v. State*, 192 Ga. App. 112, 115 (5) (385 SE2d 298) (1989) ("[F]actual assertions contained in the parties' briefs unsupported by evidence of record cannot be considered in the appellate process.") (citation omitted).

resulted from the exclusion of this expert's testimony. It follows that he cannot prevail on this ineffective assistance claim.[37]

*Judgment affirmed. Doyle, C. J., and Miller, P. J., concur.*

---

[37] See *Williams*, 277 Ga. at 858 (6) (a).